LINDSAY A. GINGER,

        Plaintiff,

v.                                    CASE NO. 2:25-CV-194

FROEDTERT HEALTH, INC.

        Defendant.

## DEFENDANT'S STATEMENT OF PROPOSED MATERIAL FACTS

Pursuant to Rule 56(c)(1) of the Federal Rules of Civil Procedure and Rule 56(b)(1)(C) of the Local Rules for the Federal District Court for the Eastern District of Wisconsin, Froedtert ThedaCare Health, Inc., formerly known as Froedtert Health, Inc. ("Froedtert" or "Defendant"), by its attorneys, von Briesen & Roper, s.c., submit the following proposed findings of fact in support of its Motion for Summary Judgment.

### The Parties and Individuals Involved

1. Froedtert is a health system that includes Froedtert Hospital, Froedtert West Bend Hospital, Froedtert Menomonee Falls Hospital, and Froedtert & Medical College of Wisconsin Community Physicians, which has over 30 primary and specialty care health centers and clinics, as well as hospitals in Neenah, Berlin, New London, Shawano, Waupaca, and Wild Rose. (Declaration of Valerie Milne ("Milne Decl."), ¶ 3).

2. Plaintiff began her employment with Froedtert in January 2020 as a RN Case Manager at Froedtert's main campus. (Declaration of Michael R. Sherer, Exhibit 1, Deposition of Lindsay Ginger ("Ginger Dep."), 18:10-15).

3. In June 2022, Plaintiff began working as an administrative supervisor in the Community Hospital Division ("CHD"). (Ginger Dep. 26:18-21; 27:8-16; Ginger Dep., Exhibit 1, LG000074).

4. CHD is comprised of two hospitals, Froedtert West Bend Hospital and Froedtert Menomonee Fall Hospital. (Ginger Dep., 27:12-16).

5. During all times relevant to the present claims, Plaintiff's supervisor was Angela Pomerenke, Director of Nursing and Patient Care Services for CHD. (Ginger Dep., 36:14-21; Sherer Decl., Exhibit 3, Deposition of Angela Pomerenke ("Pomerenke Dep."), 7:16-21).

6. During all times relevant to the present claims, Valerie Milne was a Human Resources Business Partner for CHD. (Milne Decl., ¶ 2).

7. During all times relevant to the present claims, Raymond Yanchunas was an administrative supervisor in CHD. (Ginger Dep., 32:6-12).

8. During all times relevant to the present claims, Yanchunas never had any authority to terminate Plaintiff's employment, reassign her, change her job responsibilities, or supervise her job performance. (Sherer Decl., Exhibit 2, Plaintiff's Answer to Froedtert's Request to Admit No. 1).

9. On October 8, 2021, prior to working as an administrative supervisor in CHD, Plaintiff was counseled for making negative comments that were deemed to have violated Froedtert Values and Customer Service Standards. (Ginger Dep., 20:21-26:11; Ginger Dep., Exhibit 2, FTHC_000069).

**Plaintiff's Role as Administrative Supervisor**

10. As an administrative supervisor, Plaintiff's primary responsibilities included managing and coordinating patient care and continuity, responding appropriately on behalf of

#43941503v1

hospital administration in situations requiring an immediate response, communicating critical situations appropriately, collaboration with medical staff to resolve patient care issues, and other duties as assigned. (Milne Decl., ¶ 4, Exhibit 1, FTHC_000381-383; Pomerenke Dep., 19:7-16). Additionally, administrative supervisors serve as representative of hospital leadership when regular leaders are not in the buildings, such as at night. (Sherer Decl., Exhibit 4, Deposition of Valerie Milne ("Milne Dep."), 8:5–9:22).

11. As an administrative supervisor, Plaintiff typically worked twelve-hour shifts, three days per week. Plaintiff most often worked the night shift from 7 p.m. to 7 a.m. (Ginger Dep., 28:21–29:11).

12. Part of Plaintiff's job duties as an administrative supervisor included hand-off responsibilities with the incoming administrative supervisors working the next shift. Hand-off typically lasted 20 to 30 minutes and involved discussing customer service issues, events from the day, staffing, bed availability, and a 24-hour look ahead for the hospital, among other things. (Ginger Dep., 30:11-31:12).

13. On August 18, 2022, Plaintiff was counseled regarding a complaint from another staff member regarding Plaintiff's unprofessional demeanor and disposition. During this conversation with Pomerenke, Plaintiff responded in a disrespectful and adversarial manner. (Ginger Dep., 99:8-102:13; Ginger Dep., Exhibit 8, FTHC_000120-121).

14. Pomerenke noted that Plaintiff would frequently cut her off and interrupt her in meetings, or "touch bases" between the two with regard to Plaintiff's performance. (Pomerenke Dep., 55:16-19; 63:17-18; Ginger Dep., Exhibit 8, FTHC_000120-121).

15. On November 17, 2022, Pomerenke and Milne met with Plaintiff to discuss ongoing concerns with Plaintiff's scheduling, dysfunctional communication, and problems in the

3

department. (Ginger Dep., 107:4-6; Ginger Dep., Exhibit 9, FTHC_000117; Milne Dep., 8:5–9:22; Milne Decl., Exhibit 5, FTHC_000293).

16. During this meeting, Plaintiff repeatedly interrupted Milne during Milne's attempts to relay Froedtert's concerns about Plaintiff's performance. Plaintiff later apologized to Milne for being rude. (Ginger Dep., Exhibit 9; Milne Dep., 8:5-9:22; Milne Decl., Exhibit 5, FTHC_000293).

17. Some time after this meeting, Pomerenke raised the idea of putting Plaintiff on a Performance Improvement Plan with Milne. (Milne Dep., 12:16-13:16).

18. Milne counseled against placing Plaintiff on a PIP at that time and instead to continue providing coaching to give Plaintiff more time to demonstrate improvement. (Milne Dep., 12:23-13:11).

19. Following the November meeting, Plaintiff's performance issues persisted, which caused Pomerenke to set up another similar meeting on January 10, 2023. (Ginger Dep., 112:21-113:2; Ginger Dep., Exhibit 11, FTHC_000136-137).

20. During the January 10, 2023, meeting, Pomerenke addressed Plaintiff's negative and often sarcastic comments, neglect of her duties and responsibilities, lack of attention to her educational expectations, and repeated absences (March 13-23, 2022, April 18-24, 2022, May 18-20, 2022, July 17-19, 2022, November 3, 2022, and December 28, 2022) that would ordinarily require corrective action pursuant to Froedtert policy. (Ginger Dep., 113:13-16; Ginger Dep., Exhibit 11, FTHC_000136-137).

21. Pomerenke told Plaintiff that if these issues were not corrected, the next step would be to place Plaintiff on a performance improvement plan ("PIP"). (Ginger Dep., 118:21-25; Ginger Dep., Exhibit 11, FTHC_000136-137; Milne Dep., 13:14-24).

4

#43941503v1

22. Pomerenke memorialized this meeting in an email, which she sent to Plaintiff that same day. (Ginger Dep., 119:1-3; Ginger Dep., Exhibit 11, FTHC_000136-137).

23. On February 22, 2023—approximately six weeks later—Pomerenke communicated with Milne to confirm that there had not been any improvement in Plaintiff's performance. (Milne Dep. 11:17-12:8; Milne Decl., ¶ 13, Exhibit 5, FTHC_000293).

24. Milne and Pomerenke collectively decided that it was necessary to place Plaintiff on a PIP. (Milne Dep. 12:2-15).

25. Pomerenke drafted a PIP and sent it to Milne on February 23, 2023, for Milne's review. (Milne Dep. 12:2-8). Milne and Pomerenke refined the draft between February 24 and 28, 2023. (Milne Decl., ¶ 14, Exhibit 6, FTHC_000248-253, 258-270, 275-278).

26. On February 27, 2023, Milne sent a draft PIP to her direct supervisor, Eric Andersen, for approval. The PIP identified uncorrected issues with respect to Plaintiff's communication and attendance, as well as staffing and accountability concerns, and required bi-weekly check-ins to monitor progress. (Milne Decl., ¶ 15, Exhibit 7, FTHC_000254-257).

27. On March 1, 2023, Pomerenke conferred with other CHD leaders to inform them that she and Milne would be placing Plaintiff on a PIP at the beginning of the following week due to unaddressed performance concerns. (Milne Decl., ¶ 16, Exhibit 8, FTHC_000271-274, 279-282).

28. The PIP meeting was scheduled for the week of March 7, 2023, but Plaintiff requested that the meeting be moved to the following week. In response to this request, Pomerenke moved the meeting to March 13, 2023. (Milne Decl., ¶ 17; Pomerenke Dep., 42:3-10).

#43941503v1

29. The PIP meeting took place in the Human Resources Conference Room at Froedtert West Bend Hospital. Plaintiff, Milne, and Pomerenke were present. (Pomerenke Dep., 55:20-24; Milne Decl. ¶¶ 13, 18, Exhibit 5, FTHC_000293-294, Exhibit 9, FTHC_000290).

30. Plaintiff became argumentative and loud when presented with the PIP. (Milne Dep. 33:22-23). Specifically, Plaintiff stood up from the table, tossed the copy of the PIP toward Pomerenke, and said something to the effect of "fuck off, I'm not coming back" and that she was "done with this place." (Pomerenke Dep. 60:5-13; Milne Dep. 34:3-8; Milne Decl., ¶¶ 13, 18, Exhibit 5, FTHC_000293-294, Exhibit 9, FTHC_000290).

31. Plaintiff abruptly left the meeting and walked out of the HR suite. However, she returned shortly after to obtain a copy of the PIP, and continued to dispute the information it contained. (Ginger Dep. 125:21-126:6; Pomerenke Dep. 61:1-10; Milne Decl., ¶¶ 13, 18, Exhibit 5, FTHC_000293-294, Exhibit 9, FTHC_000290).

32. Plaintiff indicated her resignation by stating that she was "done with [Froedtert]," and Pomerenke asked for Plaintiff's keys and badge. Pomerenke asked if Plaintiff was resigning, and Plaintiff stated that she didn't know. The meeting concluded at this point due to Plaintiff's continued argumentative state. (Pomerenke Dep. 61:20-24; Milne Dep. 34:9-24; Milne Decl., ¶¶ 13, 18, Exhibit 5, FTHC_000293-294; Exhibit 9, FTHC_000290).

33. Pomerenke and Milne promptly met with their respective team leaders to inform them of the outcome of Plaintiff's PIP meeting. (Pomerenke Dep., 69:5-8; 79:15-22; Milne Dep., 39:1-40:7). It was jointly determined that Plaintiff's comments during the meeting indicated her desire to resign, and the group decided to accept Plaintiff's resignation. (Milne Dep. 40:1-15; Pomerenke Dep. 85:23-24).

34.     Plaintiff also emailed Pomerenke and Milne after the PIP meeting that she would work her next two scheduled shifts and that she would review the PIP that afternoon. (Ginger Dep., Exhibit 15, FTHC_000289; Pomerenke Dep., 81:17-82:2; Exhibit 2, FTHC_000289).

35.     In response, Pomerenke contacted Plaintiff to inform her that Froedtert had decided to accept her resignation, and as a result, her employment with Froedtert had concluded. (Pomerenke Dep., 91:10-16; Milne Dep., 39:22-40:15; Milne Decl., ¶ 18, Exhibit 9, FTHC_000290).

36.     Because Froedtert accepted Plaintiff's resignation, the PIP was never instituted. (Pomerenke Dep. 85:19-24; 86:19-22).

### Plaintiff's Sexual Harassment Claim

37.     Froedtert maintains a "Harassment Free Workplace" policy, which strictly prohibits any harassment, discrimination, or any other inappropriate behavior based on race, sex, marital status, pregnancy, ethnic origin, religion, age, disability, sexual orientation, gender identity, military service, genetic information, or other legally protected status. The policy remains available to all employees through Froedtert's intranet. (Milne Decl., ¶¶ 5, 7, Exhibit 2, pp. 1-2).

38.     Pursuant to this policy, employees who witness or experience such behaviors are to promptly make a report to Human Resources or any other management personnel. These complaints are carefully investigated, and retaliation based on making such a report is prohibited. (Milne Decl., ¶ 5, Exhibit 2, p. 4).

39.     Froedtert also utilizes a Compliance Hotline, which permits employees to confidentially report actual or suspected violations of Froedtert policy or patient care standards. All employees are given a copy of this policy upon their hire and the policy remains available through Froedtert's intranet. (Milne Decl., ¶ 6, Exhibit 3).

7

40. Froedtert first became aware of Plaintiff's sexual harassment complaint on March 10, 2023, when Plaintiff made her initial contact to the Employee Concerns Resolution team. (Ginger Dep. 57:9-11; 70:2-13).

41. In her complaint, Plaintiff alleged that a fellow coworker, Yanchunas, had made unreciprocated advances upon Plaintiff that made her uncomfortable. (Ginger Dep., 57:9-11; 70:2-13; Exhibit 11, FTHC_000295-296; Milne Decl., ¶ 19, Exhibit 10, FTHC_000295-296).

42. Like Plaintiff, Mr. Yanchunas is an administrative supervisor at Froedtert. (Ginger Dep., 32:9-12). Plaintiff admitted that Yanchunas was not her supervisor and had no input with respect to decisions regarding Plaintiff's employment. (Ginger Dep., at 36:17-19; 78:11-15; Plaintiff's Answer to Froedtert's Request to Admit No. 1).

43. Yanchunas trained Plaintiff when she started at Froedtert, and Plaintiff described her initial thoughts of him as "goofy," "really nice," and someone who tried to make staff laugh. (Ginger Dep., 34:9-14; 35:4-9). Up until January 2023, Plaintiff felt Yanchunas was one of the only people in the department who liked her because he checked on her, asked how she was doing, and seemed supportive. (Ginger Dep., 40:7-41:3). The two were friendly and discussed doing social things together outside of work. (Ginger Dep., 41:20-24).

44. The primary event giving rise to Plaintiff's sexual harassment complaint took place on January 22, 2023. (Ginger Dep., 52:25-53:4).

45. On January 22, 2023, Plaintiff and Yanchunas met for lunch and to visit a specialty grocery store. (Ginger Dep., 53:5-20).

46. Plaintiff alleged that when the two were leaving, Yanchunas told her that he had fun and hugged her. Plaintiff also alleges that Yanchunas attempted to kiss her, but because

#43941503v1

Plaintiff turned her head, Yanchunas actually kissed her neck. Plaintiff and Yanchunas then left in their respective vehicles. (Ginger Dep., 54:1-10; Exhibit 3, LG000021).

47. Plaintiff alleged that sometime during shift hand-off between January 31 and February 1, 2023, Yanchunas hugged Plaintiff, tried to kiss her again, and smacked her butt while in the administrative supervisor office. (Ginger Dep., 60:7-61:17, Exhibit 3, LG000021).

48. Plaintiff referenced one other instance where Yanchunas placed his hands on her shoulders, but did not specify when this occurred. (Ginger Dep., 66:2-20; Exhibit 3, LG000021).

49. Plaintiff also alleged that Yanchunas had sent Plaintiff messages over Froedtert's employee communications system—WebEx—outside of work hours. The messages were not facially inappropriate and were largely work-related. Plaintiff confirmed that there was no issue with the *content* of the messages, but rather that the messages were sent during non-work hours. (Ginger Dep., 68:4-18).

50. Plaintiff and Yanchunas worked different schedules, so the two would only see each other a maximum of 20 minutes a few times per week during shift "hand-offs," if they saw each other at all. (Ginger Dep., 39:13-40:6).

51. Before making her complaint, Plaintiff intentionally avoided seeing Yanchunas, which kept their contact extremely minimal. There were no further incidents. (Ginger Dep., 64:3-65:22; Milne Decl., ¶ 19, Exhibit 10, FTHC_000307).

52. Plaintiff did not inform any Froedtert leadership of her concerns until March 10, 2023, when she spoke to Ian Audas-Anderson in Froedtert's Human Resources department. (Ginger Dep., 57:9-11; 70:2-13).

53. Audas-Anderson then contacted Milne to inform her of the report. (Milne Dep., 16:10-23; Milne Decl., ¶ 19, Exhibit 10, FTHC_000296-297, 304).

54. Upon being notified of Plaintiff's report, Milne contacted Pomerenke to notify her of Plaintiff's complaint and to discuss next steps. (Milne Dep., 30:2-10; Milne Decl., ¶ 19, Exhibit 10, FTHC_000304).

55. Milne also spoke with Plaintiff that day to obtain an in-depth record regarding Plaintiff's allegations. (Ginger Dep., 72:20-24; Milne Dep., 37:22-38:25; Milne Decl., ¶ 19, Exhibit 10, FTHC_000306-307).

56. Froedtert immediately reviewed Plaintiff's and Yanchunas's schedules to ensure that there would be no shift overlap between the two and that they would not be in the same building, which would have permitted Plaintiff to completely avoid seeing Yanchunas at work. (Pomerenke Dep. 38:2-15; Milne Dep. 53:17-54:2, Exhibit 6, FTHC_000316; Milne Decl., ¶ 19, Exhibit 10, FTHC_000304).

57. Since her March 10, 2023 report, Plaintiff stated she has not had any contact with Yanchunas. (Ginger Dep. 79:4-9).

58. On March 13, 2023, prior to her PIP meeting, Plaintiff emailed Milne to relay additional concerns about the subject of her complaint. (Ginger Dep. 83:22-24).

59. Froedtert conducted an investigation of all available facts, which included an interview of Yanchunas. This interview took place on March 15, 2023. (Milne Dep., 73:18-74:4; Milne Decl., ¶¶ 19-21, Exhibits 10-12).

60. Yanchunas represented during his interview that he had never touched or attempted to touch Plaintiff, either at or outside of work. (Milne Decl., ¶ 20, Exhibit 11).

61. Milne also reviewed the WebEx history between Plaintiff and Yanchunas, and Milne was unable to locate any messages indicative of harassment. (Milne Dep. 73:19-24; 89:21-90:5; Milne Decl., ¶ 19, Exhibit 10, FTHC_000307).

#43941503v1

62. Froedtert's investigation concluded on March 20, 2023, and was conducted completely independently from the issues of Plaintiff's work performance. (Milne Decl., ¶ 21, Exhibit 12; Milne Dep., 37:20-38:2; Pomerenke Dep., 47:25-48:4).

63. The results of Froedtert's investigation were inconclusive and Plaintiff's claims could not be substantiated. Despite this, Froedtert required Yanchunas to complete sexual harassment training. Froedtert indicated, in no uncertain language, that it does not "tolerate unprofessional or inappropriate behavior that creates an uncomfortable work environment for others," and Yanchunas was warned that any further concerns regarding his conduct could result in termination. *Id.* (Milne Decl., ¶ 21, Exhibit 12).

64. Yanchunas was also assigned additional training despite the inconclusive results and completed that training on March 23, 2023. (Milne Decl., ¶¶ 21, 22, Exhibits 12 and 13).

65. Yanchunas was later terminated in the fall of 2024 for inappropriate workplace communications that continued despite warnings and training to address the conduct. (Pomerenke Dep., 93:16-94:11; 97:7-9).

66. Plaintiff completed sexual harassment training annually on February 7, 2020, May 19, 2021, and June 23, 2022. (Milne Decl., ¶ 9).

Dated this 4th day of May, 2026.

VON BRIESEN & ROPER, s.c.

By:___*s/ Michael R. Sherer*_____
   Doris E. Brosnan, SBN 1031897
   Michael R. Sherer, SBN 1132052
   411 East Wisconsin Avenue
   Milwaukee, Wisconsin 53202
   262-923-8668 (Direct)
   414-276-1122 (Office)
   michael.sherer@vonbriesen.com

11