**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**LINDSAY GINGER,**

**Plaintiff,**

**v.** **Case No. 25-CV-194**

**FROEDTERT THEDACARE HEALTH, INC.,**[1]

**Defendant.**

---

## DECISION AND ORDER

---

### 1. Procedural History

Plaintiff Lindsay Ginger brings sex discrimination and retaliation claims under Title VII against her former employer, Froedtert Thedacare Health, Inc. (ECF No. 1.) Froedtert has filed a motion for summary judgment, arguing that both claims fail as a matter of law. (ECF No. 29.) Both parties have consented to the full jurisdiction of this court pursuant to 28 U.S.C. § 636(c). (ECF Nos. 4, 12.) The court has jurisdiction under 28 U.S.C. § 1331. The motion is fully briefed and ready for resolution.

[1] The defendant has indicated it was formerly known as Froedtert Health, Inc., the name presently reflected on the docket. (ECF No. 29 at 1.) The Clerk of Court shall update the case caption accordingly.

## 2. Facts

The following factual summary is derived primarily from Froedtert's proposed findings of fact (ECF No. 30) pursuant to Ginger's response thereto (ECF No. 36). The facts are undisputed unless otherwise noted.

Ginger started working for Froedtert as an RN case manager in January 2020. (ECF No. 36, ¶ 2.) She switched roles in June 2022 and worked for Froedtert as an administrative supervisor until March 13, 2023. (*Id.*, ¶¶ 3, 28–35.) During all times relevant to the present claims, Ginger's supervisor was Angela Pomerenke, Director of Nursing and Patient Care Services in the Community Hospital Division. (*Id.*, ¶ 5.) Valerie Milne was a Human Resources Business Partner for the Community Hospital Division. (*Id.*, ¶ 6.)

The parties dispute Froedtert's allegations about Ginger's performance issues from August through November 2022. (ECF No. 36, ¶¶ 13–17.) However, they agree that, after a performance meeting on January 10, 2023, Pomerenke told Ginger that the next step would be a performance improvement plan ("PIP"). (*Id.*, ¶¶ 20–21.) Ginger acknowledges that her attendance was a performance issue at that time but disputes Froedtert's contention that Pomerenke also addressed her "negative and often sarcastic comments, neglect of her duties and responsibilities, [and] lack of attention to her educational expectations." (*Id.*, ¶¶ 20–21.)

Ginger concedes that Pomerenke memorialized the January 10 meeting in an email sent to Ginger the same day. (ECF No. 36, ¶ 22.) The email reflects Pomerenke's requests that Ginger: (1) "continue to select [her] words carefully with staff… [because] many times when phrases are stated as lightly/jokingly, the phrase is not taken lightly"; (2) "not dictate patient placement with the bed planners" but be a "bridge" and "support relationship building"; (3) complete her education requirements by the deadline now extended for a third time; and (4) expect corrective action and a "performance improve plan" because her attendance reflected six "occurrences." (ECF No. 31-4.)

On February 22, 2023, Pomerenke communicated with Milne to confirm that there had not been any improvement in Ginger's performance. (ECF No. 36, ¶ 23.) Milne and Pomerenke decided that it was necessary to place Ginger on a PIP and drafted one together. (*Id.*, ¶¶ 24–25.) On February 27, 2023, Milne sent a draft PIP to her direct supervisor, Eric Andersen, for approval. (*Id.*, ¶ 26.) The PIP identified uncorrected issues with respect to Ginger's communication and attendance, as well as staffing and accountability concerns and required biweekly check-ins to monitor progress. (*Id.*)

On March 1, 2023, Pomerenke conferred with other leaders in the Community Hospital Division to inform them that she and Milne would be placing Ginger on a PIP at the beginning of the following week due to unaddressed performance concerns. (ECF No. 36, ¶ 27.) The PIP meeting was scheduled for March 7, 2023, but rescheduled to March

13, 2023, at Ginger's request. (*Id.*, ¶ 28.) Ginger argues that she was unaware of the purpose of the meeting beforehand. (*Id.*)

On Friday, March 10, 2023, Ginger lodged a sexual harassment (apparently verbal) complaint with the Employee Concerns Resolution team. (ECF No. 36, ¶ 40.) Ginger alleged that a coworker, Raymond Yanchunas, had made unreciprocated advances upon her that made her uncomfortable. (*Id.*, ¶ 41.) Like Ginger, Yanchunas was an administrative supervisor for the Community Hospitals Division. (*Id.*, ¶ 7.) Ginger disputes Froedtert's contention that Yanchunas was not her supervisor. (*Id.*, ¶ 42.)

Up until January 2023 Ginger "felt Yanchunas was one of the only people in the department who liked her because he checked on her, asked how she was doing, and seemed supportive." (ECF No. 36, ¶ 43.) The two were friendly and discussed doing social things together outside of work. (*Id.*)

On January 22, 2023, Ginger and Yanchunas met for lunch and to visit a specialty grocery store. (ECF No. 36, ¶ 45.) Ginger alleges that, when the two were leaving (presumably the grocery store, although the proposed findings of fact do not say), Yanchunas told Ginger that he had fun, hugged her, and attempted to kiss her but actually kissed her neck because she turned her head. (*Id.*, ¶ 46.) The two then left in their respective vehicles. (*Id.*)

In her sexual harassment complaint Ginger also alleged that, sometime during shift hand-off between January 31 and February 1, 2023, Yanchunas hugged her, tried to

kiss her again, and smacked her butt while in the administrative supervisor office. (ECF No. 36, ¶ 47.) At her deposition Ginger referenced one other instance where Yanchunas placed his hands on her shoulders, but she did not specify when this occurred. (*Id.*, ¶ 48.)

Ginger also alleged in her sexual harassment complaint that Yanchunas sent her messages over Froedtert's employee communications system—WebEx—outside of work hours. (ECF No. 36, ¶ 49.) Froedtert characterizes the messages as "not facially inappropriate" and "largely work-related." (*Id.*) Ginger contends that the messages "were social in nature, and the frequency and timing of the messages formed part of the unwelcome course of conduct." (*Id.*)

Milne testified during her deposition that as part of her investigation into Ginger's sexual harassment allegations she requested all communications via Webex related to Ginger and Yanchunas. (ECF No. 32-4 at 87:13–89:9.) According to the exhibit Milne referenced during her deposition (ECF No. 32-4 at 38–39), Yanchunas's Webex messages with Ginger, after the alleged incident on January 22, 2023, consisted of the following:

- Yanchunas: February 7, 2023 at 15:19: "How are you?"
- Yanchunas: February 9, 2023 at 4:39: "How is your shift so far?"
- Ginger: February 9, 2023 at 4:40: "Its fine. Are you working today?"
- Yanchunas: February 9, 2023 at 4:40: "I'm off today and then FWB Friday and Saturday."
- Ginger: February 9, 2023 at 4:41: "Have a good day off"
- Yanchunas: February 15, 2023 at 5:01: "Good morning. How was your night?"

- Ginger: February 15, 2023 at 5:01: "It was fine. Not much going on here."
- Yanchunas: February 15, 2023 at 5:38: "Glad you had a good shift."
- Yanchunas: March 4, 2023 at 5:28: "How are you these days?"
- Ginger: March 4, 2023 at 5:32: "Doing fine"

(ECF No. 32-4 at 39.)

An employee in Froedtert's human resources department contacted Milne to inform her of Ginger's sexual harassment complaint the same day she made it—Friday, March 10, 2023. (ECF No. 36, ¶¶ 52–53.) Milne then contacted Pomerenke to notify her of Ginger's complaint and to discuss next steps. (*Id.*, ¶ 54.) Milne spoke with Ginger on March 10 to obtain an in-depth record regarding her allegations. (*Id.*, ¶ 55.) Froedtert also reviewed Ginger's and Yanchunas's schedules to ensure there would be no shift or building overlap so that Ginger could avoid seeing Yanchunas at work. (*Id.*, ¶ 56.)

On Monday, March 13, 2023, Ginger, Milne, and Pomerenke met in person to discuss the PIP. (ECF No. 36, ¶¶ 28–29.) Froedtert contends that Ginger "became argumentative and loud when presented with the PIP" and "stood up from the table, tossed the copy of the PIP toward Pomerenke, and said something to the effect of 'fuck off, I'm not coming back' and that she was 'done with this place.'" (*Id.*, ¶ 30.)

Ginger disputes that she became "argumentative and loud," and points to her deposition testimony that she did not raise her voice. (ECF No. 36, ¶ 30 (citing ECF No. 32-1 at 123:16–18).) Ginger maintains that she "slid" rather than "tossed" the PIP

across the conference room table. (*Id.* (citing ECF No. 32-1 at 123:19–23).) Ginger also claims she did not say she was not coming back and specifically said she was not quitting. (*Id.* (citing ECF No. 32-1 at 124:25–125:17) (reflecting Ginger's testimony that she "can't really remember exactly what [she] said" but that she did say she would "talk about it [the PIP] with you another time" and answered "no" when asked if she was quitting).)

Ginger also contends that Pomerenke contradicted Milne because Pomerenke testified that Ginger said "fuck off" and "I'm done with this place" but never that she said, "I'm not coming back." (ECF No. 36, ¶ 30 (citing ECF No. 32-3 at 58:10–14; 60:5–24).) Pomerenke testified during her deposition that she understood Ginger to have quit during the meeting when "[s]he said she was done with us." (ECF No. 32-3 at 61:20–22.) Pomerenke tried to ask for Ginger's keys and badge but did not know if Ginger heard her request. (ECF No. 32-3 at 61:23–62:1.)

Milne testified at her deposition that Ginger "stood up, tossed or flung the performance improvement plan at [Pomerenke]; told I assumed it was [Pomerenke] and I to fuck off, that she was done with this place, she wasn't coming back, grabbed her sweater and exited the HR department." (ECF No. 32-4 at 33:15–34:8.)

Ginger emailed Pomerenke and Milne after the PIP meeting and stated that she would work her next two scheduled shifts and review the PIP that afternoon. (ECF No. 36, ¶ 34.) In response, Pomerenke contacted Ginger to inform her that Froedtert had

decided to accept her resignation and, as a result, her employment with Froedtert had concluded. (*Id.*, ¶ 35.)

**3. Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence that would support a reasonable jury verdict. *Celotex Corp*., 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

To survive summary judgment, a party cannot just rely on her pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc*.,

406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc*., 330 F.3d 991, 994 (7th Cir. 2003)).

## 4. Analysis

### 4.1. Sex Discrimination

Ginger alleges in her complaint that she experienced sexual harassment by a co-worker that created a hostile work environment. (ECF No. 1, ¶¶ 29–33.)

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). "An employer violates this provision when 'discrimination based on sex … create[s] a hostile or abusive work environment." *Equal Emp. Opportunity Comm'n v. Costco Wholesale Corp.*, 903 F.3d 618, 624 (7th Cir. 2018) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)).

To establish a sex-based hostile work environment claim under Title VII, a plaintiff must demonstrate that

> (1) her work environment was objectively and subjectively offensive, (2) the harassment she complained of was based on her [sex], (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability.

*Anderson v. Street*, 104 F.4th 646, 652 (7th Cir. 2024) (quoting *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018)).

Froedtert argues that Yanchunas's conduct was not objectively severe and pervasive and, even if it was, there can be no employer liability because there is no

evidence that Froedtert was negligent in preventing the harassment from occurring or failing to properly address it once reported. (ECF No. 29 at 9–15.)

"In determining whether an actionable hostile work environment claim exists, the Court is to look at 'all circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Stitz v. Am. Fam. Mut. Ins. Co.*, 585 F. Supp. 3d 1187, 1191 (E.D. Wis. 2022) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

Although Yanchunas's conduct may have been unprofessional and inappropriate, caselaw within the Seventh Circuit has held that incidents more severe and frequent than those involved here did not amount to a hostile work environment. *See, e.g.*, *Wheeler v. Brady Corp.*, 712 F. Supp. 2d 801, 821–24 (E.D. Wis. 2010) (finding conduct was not sufficiently severe where harasser allegedly touched employee below her mid-calf, asked if she shaved for him, told her she was beautiful, asked whether she had been in a lesbian relationship, asked whether she had any naked photographs of herself while pregnant, asked what her favorite sexual positions were, made loud kissing noises in her cubicle, hoping other employees would believe they were having an affair, extended her multiple dinner invitations, and gave her an unwanted kiss on the lips).

"A fine line exists between touching that is sufficiently severe and touching that does not constitute sex harassment as a matter of law." *Wheeler*, 712 F. Supp. 2d at 823.

But the Seventh Circuit has held that "[t]here are some forms of physical contact which, although unwelcome and uncomfortable for the person touched … typically will not be severe enough to be actionable in and of themselves." *Id.* (quoting *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000)). "A hand on the shoulder, a brief hug, or a peck on the cheek lie at this end of the spectrum." *Swyear*, 911 F.3d at 882 (quoting *Hostetler*, 218 F.3d at 808). "Even more intimate or more crude physical acts—a hand on the thigh, a kiss on the lips, a pinch of the buttocks—may be considered insufficiently abusive to be described as 'severe' when they occur in isolation." *Id.* (quoting *Hostetler*, 218 F.3d at 808).

Ginger's allegations that Yanchunas hugged and tried to kiss her on one occasion, hugged and tried to kiss her and smacked her butt on a second occasion, and touched her shoulders on a third occasion, considered in combination with his messaging, lie on the non-actionable end of the spectrum. *See Cooper v. Eaton Corp.*, 498 F. Supp. 3d 1053, 1065–66 (N.D. Ind. 2020) (citing the *Hostetler* holding in granting summary judgment for the defendant on a claim that a male coworker poked a female coworker several times around her waistline, bra line, and possibly touched her breast).

Despite Ginger's contention that Yanchunas messaged her outside work hours, nearly all of the messages from November 1, 2022, through March 4, 2023, appear to have been sent during Ginger's working hours, as she testified that she typically worked twelve-hour night shifts from 7pm to 7am. (*See* ECF No. 23-4 at 38–39; ECF No. 36, ¶ 11.)

Regardless, Ginger has not identified a single message that might be construed as "off-color" or implying a sexual undertone. *See Anderson*, 104 F.4th at 652 ("'[O]ff-color comments, isolated incidents, teasing, and other unpleasantries' are not enough for a Title VII sexual harassment claim." (quoting *Swyear*, 911 F.3d at 881).

The alleged physical contact from Yanchunas was isolated in nature and does not rise to the level of severe or pervasive. *See Anderson*, 104 F.4th at 651–52 (affirming summary judgment for defendant employer where various co-workers grabbed plaintiff's butt once, hugged her inappropriately two or three times, called her a  bitch, and told her to wear tight, form-fitting clothing because it looked better on her); *Bilal v. Rotec Indus., Inc.*, 326 F. App'x 949, 957 (7th Cir. 2009) (affirming district court's decision that alleged incidents were insufficient to sustain a hostile work environment claim where company CEO called plaintiff a "fox," stated her job would be easier if she had sex with him, told her he wished she would quit her job so he could "have" her, and took a piece of chocolate from his mouth and placed it in her mouth while she was speaking); *Kaiser v. ACCO Mgmt. Co., LLC*, No. 23-CV-1539-JPS, 2026 WL 699601, at *5, 2026 U.S. Dist. LEXIS 50985, at *13–14 (E.D. Wis. Mar. 12, 2026) (finding alleged conduct was not severe or pervasive enough to constitute a hostile work environment where co-worker grabbed her hands and rubbed them between his own, touched her back, and pressed himself against her, making contact with her breasts).

At a minimum, no genuine dispute of material fact exists as to the requirement that the harassment be so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment. *See Stitz*, 585 F. Supp. 3d at 1191. Accordingly, the court will grant Froedtert's motion for summary judgment on Ginger's Title VII claim for sex discrimination based on a hostile work environment.

**4.2. Retaliation**

Ginger also alleges in her complaint that Froedtert terminated her in retaliation for opposing sexual harassment in the workplace.[2] (ECF No. 1, ¶¶ 34–38.)

"Title VII prohibits employers from retaliating against employees for complaining about unlawful employment practices." *Kedas v. Ill. Dep't of Transp.*, 149 F.4th 951, 956 (7th Cir. 2025) (citing 42 U.S.C. § 2000e-3(a); *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006)). "To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) she engaged in an activity protected by the statute; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Anderson*, 104 F.4th at 654 (citation omitted).

If the plaintiff establishes a prima facie case of retaliation, the defendant "must then offer a legitimate, nondiscriminatory reason for its adverse action." *Brooks v. City of*

---

[2] Ginger also stated in count two that Froedtert placed her on a PIP but did not directly allege that it did so as an act of retaliation. (ECF No. 1, ¶¶ 37–38.) Ginger also does not argue in her brief in response to Froedtert's motion for summary judgment that her placement on a PIP constituted an adverse action in support of her claim for retaliation. (ECF No. 33.) Therefore, the court will focus only on her termination with respect to this claim.

*Pekin*, 95 F.4th 533, 539 (7th Cir. 2024). "If the employer has offered a nondiscriminatory explanation for its action, a Title VII claim turns on whether there is sufficient evidence for a reasonable jury to conclude that the explanation is pretext for illegal discrimination or retaliation." *Upchurch v. Indiana*, 146 F.4th 579, 587 (7th Cir. 2025). "Pretext is a lie, specifically a phony reason for some action, not just faulty reasoning or mistaken judgment on the part of the employer." *Id.* (cleaned up) (quoting *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892 (7th Cir. 2025)).

Froedtert claims that Ginger cannot establish causation between her sexual harassment complaint and her separation from employment. (ECF No. 29 at 17.) Ginger claims that the timing of these events provides powerful circumstantial evidence of causation. (ECF No. 33 at 12.)

"[T]he timing of an employee's [adverse employment action] may be circumstantial evidence of a retaliatory motive," if the adverse action occurred "fairly soon after the employee's protected expression." *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009–10 (7th Cir. 2000) (citations omitted). While the temporal proximity between Ginger's sexual harassment complaint on a Friday and her termination the following Monday would be suspicious if considered in a vacuum, the attendant circumstances do not support an inference of causation. Before she lodged her sexual harassment complaint Ginger's superiors already intended to place her on a PIP, pushed the meeting date back at her request, and purportedly acted to finalize her separation from employment based

on her behavior at the meeting. On this record, no reasonable fact finder could infer a causal relationship between the sexual harassment complaint and her termination.

Even if Ginger established a prima facie case, Froedtert claims it has established a legitimate, nondiscriminatory reason for terminating her based on her history of performance issues leading up to her placement on a PIP and the decision to accept her resignation based on her actions and statements at the PIP meeting. (ECF No. 29 at 20.)

Ginger argues that Froedtert's continued insistence that she had quit despite her evidence to the contrary should be considered evidence of pretext for a wrongful motive. (ECF No. 33 at 12.) She claims that she said she was not quitting during the PIP meeting and points out that she indicated she was not quitting via the email she sent later that same day. (*Id.*) Froedtert claims that Ginger quit during the meeting and that it did not allow her to rescind her resignation because she had a history of performance issues and told her superiors to "fuck off." (ECF No. 29 at 21.) Froedtert argues that, even assuming Ginger's separation from employment was a termination, Ginger has not provided any evidence to indicate her separation was pretextual. (ECF No. 37 at 12.)

Ginger contends that whether she said "fuck off" is immaterial because Pomerenke stated during her deposition that the swearing did not impact her decision to "accept[] [Ginger's] resignation." (ECF No. 33 at 4.) But this contention is taken out of context and inconsistent with Pomerenke's testimony. Pomerenke was asked if she disciplined Ginger for saying "fuck off" or simply accepted her resignation, and

Pomerenke answered that she was accepting her resignation. (ECF No. 32-3 at 86:19–22.) Pomerenke also testified that Ginger's unprofessional conduct, including telling a leader to "fuck off" during the meeting, was relevant to her decision to accept Ginger's resignation and to not allow to her revoke the resignation. (ECF No. 32-3 at 86:5–88:21.)

Ginger also claims that other nurses commonly swore and said "fuck" without getting punished. (ECF No. 33 at 4.) "[O]ne means of demonstrating pretext is to put forth evidence that employees outside the protected class who were involved in misconduct of comparable seriousness were not subject to similar adverse employment action." *Johnson v. West*, 218 F.3d 725, 733 (7th Cir. 2000). But Ginger has not offered sufficient evidence that similarly situated employees engaged in similar conduct without punishment. (*See* ECF No. 33 at 4.) Ginger cites Yanchunas's deposition testimony that "we all used that language" and it would have "been hard for [Pomerenke] to avoid it." (*Id.*) But she did not provide Yanchunas's deposition on the record.

In any event, an employer is allowed to differentiate between general swearing in the workplace and the insubordinate behavior of *swearing at* a superior. *See Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013) (observing that courts "do not second guess an employer's business decision, but neither do [they] 'abandon good reason and common sense in assessing an employer's actions'"); *Flores v. Preferred Tech. Grp.*, 182 F.3d 512, 515 (7th Cir. 1999) ("Insubordination is a legitimate, nondiscriminatory reason for

firing an employee.") Ginger does not contest that she engaged in the insubordinate behavior in question.

Froedtert contends that Ginger's inappropriate and unprofessional behavior during the PIP meeting is a legitimate, nondiscriminatory reason for her separation from employment that cannot be overcome by mere temporal proximity. (ECF No. 37 at 11.) Indeed, "any inference of causation supported by temporal proximity may be negated by circumstances providing an alternative explanation for the challenged action." *Jokich v. Rush Univ. Med. Cent.*, 42 F.4th 626, 634 (7th Cir. 2022).

Given Ginger's undisputed poor performance history that instigated the PIP meeting and her undisputed unprofessional and insubordinate behavior during the meeting, no reasonable factfinder could find Froedtert's explanation to be pretextual. Ginger's evidence of pretext boils down to the timing of the events. On this record, the timing is not so suspicious as to undermine Froedtert's legitimate, nondiscriminatory reason.

Because Ginger has not established a prima facie case and, even if she did, Froedtert has provided a legitimate nondiscriminatory reason for her termination, the court will grant Froedtert's motion for summary judgment on Ginger's Title VII claim for retaliation.

**5. Conclusion**

**IT IS THEREFORE ORDERED** that the defendant's motion for summary judgment (ECF No. 28) is **granted**. This action is dismissed with prejudice. The Clerk of Court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 28th day of September, 2026.

William E. Duffin

WILLIAM E. DUFFIN
U.S. Magistrate Judge